IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RENEE IANNOTTI,** | CIVIL ACTION NO. |
| **Plaintiff,** | |
| v. | |
| **ST. BARNABAS HEALTH SYSTEM, INC.** **and THE WOODLANDS AT ST. BARNABAS, INC.,** | |
| **Defendants.** | |

**COMPLAINT**

**I.   PRELIMINARY STATEMENT**

By this action, Plaintiff, Renee Iannotti, seeks wage loss, compensatory, punitive, and liquidated damages, costs and attorneys' fees as a result of being terminated by Defendants in retaliation for her complaint of wage and hour violations, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3).  Plaintiff seeks wages earned, liquidated damages, costs, and attorneys' fees as a result of Defendants' failure to pay minimum and overtime wages, in violation of the FLSA, 29 U.S.C. §§ 206, 207.   Plaintiff also seeks wages earned, costs, and attorneys' fees as a result of Defendants' failure to pay minimum and overtime wages, in violation of the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. § 333.101 *et. seq.* Plaintiff also seeks wages earned, costs, attorneys' fees, and liquidated damages as a result of

1

Defendants' improper withholding of wages Plaintiff earned, in violation of the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.1 *et. seq*.

## II.   JURISDICTION

1. This court has jurisdiction of this matter by virtue of 28 U.S.C. § 1331, in that this is a civil action wherein the matter in controversy arises under the laws of the United States.

2. This court also has jurisdiction of this matter under 28 U.S.C. § 1367, in that this is a civil action of which this federal district court has original jurisdiction, and certain of Plaintiff's claims are brought under Pennsylvania state law, which are related to the federal claim in this action in that they form part of the same case or controversy under Article III of the Constitution of the United States.

3. Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that this is a civil action in which jurisdiction is not founded solely on diversity of citizenship and the acts constituting a substantial part of the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

## III.   PARTIES

4. Plaintiff, Renee Iannotti, is an adult female who resides at 4309 Partell Street, Butler, PA 16001. At the time of the incident complained of in this lawsuit and presently, she was and is a citizen of the Commonwealth of Pennsylvania and the United States of America.

5. Defendant, St. Barnabas Health System, Inc. ("St. Barnabas"), is a Pennsylvania nonprofit corporation that provides a spectrum of health services, including retirement communities, living assistance facilities, skilled nursing homes, a community outpatient medical center, and rehabilitation therapy, with business headquarters located at 5850 Meridian Road,

Gibsonia, PA 15044.  Upon information and belief, St. Barnabas also owns and operates Conley Resort, which is owned by St. Barnabas.

6.      Defendant, The Woodlands at St. Barnabas, Inc. ("The Woodlands"), is a Pennsylvania nonprofit corporation that operates a retirement community, with business headquarters located at 100 Laurel Oak Drive, Valencia, PA 16059.  Upon information and belief, The Woodlands is wholly owned by St. Barnabas.

### IV.     STATEMENT OF CLAIM

7.      In October of 1984, Iannotti began her career with Conley Resort (the "Resort") as a clerk and ultimately worked her way up to the position of Business Manager.

8.      The Resort is located in Butler, PA and contains golf, swimming, hotel, meeting, and banquet facilities.

9.      Prior to 2016, Iannotti was an hourly employee, paid at the rate of $16/hour. Iannotti also received commissions totaling one percent of all of the Resort's revenues.

10.     As Business Manager, Iannotti was responsible for overseeing all of the Resort's operations, including its accounting, staff, restaurant, and pool maintenance.  Because of her wide-ranging responsibilities, she frequently had to work over 40 hours/week.

11.     On January 1, 2016, St. Barnabas acquired the Resort, and retained Iannotti as its Business Manager.  It also maintained Iannotti as an hourly employee with the same commission structure.

12.     Immediately following the acquisition, Iannotti began receiving her paychecks from The Village at St. Barnabas, a retirement community owned by St. Barnabas.

13. In all of her years working at the Resort, Iannotti never had an issue being compensated for the hours that she worked until St. Barnabas hired Dave Smith as the Resort's General Manager. Smith started in that role on September 1, 2016.

14. In November 2016, Smith announced a prohibition on overtime pay during a meeting with Emily Taylor, the Resort's Sales Manager, Matt Neff, its Head Chef, and Iannotti.

15. Iannotti, realizing she could not fulfill her duties without overtime, told Smith during that meeting of the predicament his policy created. Smith responded that she had to "make it work," and should leave work early or come in late, as necessary. When Iannotti explained the many ways in which it was not going to work, Smith kept repeating, "It is going to have to work."

16. Almost immediately, Smith's solution proved to be unrealistic and untenable for Iannotti. Several times, Iannotti found herself forced to choose between following Smith's policy and leaving, meaning that the front desk would not be staffed, daily accounting would not be completed, pool maintenance would not be done, and/or trainees would be unsupported, or clocking out and performing the necessary tasks.

17. Iannotti always chose the latter because she always looked out for the best interests of the Resort, and she realized that Smith would place the blame on her if those duties were not fulfilled.

18. Smith was aware of this uncompensated work that his ban on overtime caused, as he either personally witnessed it, reviewed the results of it, or directly benefitted from it, yet did nothing to compensate Iannotti for her time.

19. In one instance, on December 3, 2016, Iannotti worked off the clock for four and a half hours in order to support a new desk clerk, Emma Federkeil, who was overwhelmed with customers. When Iannotti told Smith on the following Monday that she worked overtime, Smith

4

told her to adjust her time records. Iannotti responded that she clocked out before helping Federkeil, so no adjustment was necessary unless Smith wanted to pay her. Smith ignored Iannotti's response and walked away.

20. Smith also personally exacerbated Iannotti's overtime predicament.

21. On several occasions, Smith asked Iannotti at the end of her shift to finish reports and also scheduled compulsory meetings that ran past Iannotti's shift. When Iannotti would explain that completing the report he wanted required overtime, Smith would respond, "I need the report done, but you can't get overtime." Defeated, and with her shift over, Iannotti would clock out as Smith watched and then return to work in order to comply with his requests.

22. Smith also frequently texted Iannotti on her days off with requests for her to complete summaries of the Resort's business from the prior day. The summaries had to include all business through 2:00 a.m. Because of that requirement, if, for example, Iannotti worked on a Friday, but was off on Saturday, the report could not be completed during her shift and had to wait until 2:00 a.m. on Saturday morning. Instead of waiting until her next scheduled day, Smith demanded that Iannotti complete the summaries on her day off. Due to Smith's pressure, Iannotti's practice was to text Smith that she was going to go into work. Iannotti then would go to the office and complete the summaries, unpaid for her time.

23. In addition to being forced to work for free, Smith subjected Iannotti to other unprofessional behavior, including closing his office door at the sight of Iannotti, belching loudly, and rudely dismissing her contributions.

24. After months of the negative working conditions created by Smith, Iannotti, stressed and anxious, asked to meet with Margaret Horton, St. Barnabas's Executive Director of Human Resources.

25. During their meeting on January 20, 2017, Iannotti provided detailed descriptions of Smith's behavior and overtime abuse. Specifically, Iannotti told Horton about Smith ordering her to complete reports and attend meetings at the end of her shift, as he watched her clock out and return to work to complete his assigned tasks. She also recounted several other examples of times that she worked off the clock in order to fulfill her duties. Iannotti summarized the situation to Horton as, she was "doing other people's jobs and not getting paid for it."

26. In response to Iannotti's complaint of overtime violations, Horton simply and confusingly said "that is a wage and hour issue, and that needs to be addressed through wage and hour."

27. When Iannotti told Horton that Smith's treatment of her made her physically ill and depressed and caused her to lose sleep, Horton said that she should go see a therapist because she has good health insurance.

28. Iannotti followed that advice and started therapy on January 24, 2017.

29. Starting just days after Iannotti's meeting with Horton, Smith's mistreatment of her intensified, as Smith stopped speaking to Iannotti almost entirely. Smith's retaliatory actions continued until Iannotti's termination.

30. The week after her complaint, Smith began scheduling Iannotti to work almost exclusively as a server in the Resort's restaurant or to staff banquets, despite Iannotti remaining the Business Manager. Smith also punitively scheduled her to work eight days in a row.

31. Because of Smith's actions, Iannotti was forced to work more uncompensated time at home or at odd hours to complete her Business Manager tasks.

32. On or about January 29, 2017, a day off for Iannotti, Taylor directed Iannotti to prepare for a meeting of St. Barnabas's managers the next day. When Iannotti responded that she was off that day, Taylor said that it needed to be done. Iannotti had no doubt that this

command came from Smith because at this point he was issuing all directives through Taylor. Iannotti relented and worked four unpaid hours that day.

33. As Business Manager, Iannotti expected to attend the meeting with her fellow managers. Instead, Smith scheduled her to work as a server for the meal at the meeting, which degraded and embarrassed Iannotti.

34. When Iannotti questioned Smith about the changes to her schedule, he claimed that it was so she could train new employees in the server and banquet positions. Smith had no response when Iannotti pointed out that he always scheduled her to only work alone or with experienced employees.

35. On March 8, 2017, Horton called Iannotti and asked if she could come in for a meeting on March 13th. According to Horton, the meeting was to follow-up to see if the things they discussed in January were getting better. Iannotti agreed to the meeting.

36. When Iannotti arrived at Horton's office on March 13th, she was surprised to see that JD Turco, Senior Vice President and CFO of St. Barnabas, was there as well. The meeting started with small talk, which abruptly ended when Turco announced that the reason for the meeting was to tell Iannotti that it was her last day. Turco then informed Iannotti that security was in her office cleaning out her desk.

37. When Iannotti asked why she was losing her job, Turco informed her that the company was moving in a different direction and it did not think she was on board for its plans.

38. Iannotti, suspicious of the timing of her termination, asked Horton if she told anyone about what they discussed during their January 20th meeting. Horton cryptically responded that she "took it up the ladder."

39. Two days later, Iannotti's replacement started.

40. The alleged basis for Iannotti's termination was pretextual. Defendants' direction changed only after Iannotti complained about wage and hour violations. Retaliation by Smith started almost immediately after Iannotti's complaint and culminated with her termination. Additionally, upon information and belief, St. Barnabas started the hiring process for Iannotti's replacement in early February with a job posting on Indeed.com—right after her complaint.

41. As a result of Defendants' termination of Iannotti, she has suffered and continues to suffer damages, including, but not limited to, loss of wages and benefits, loss of reputation, loss of career opportunities, anxiety, emotional pain and suffering, mental anguish, humiliation and inconvenience, and other nonpecuniary losses.

## V.    CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF FAIR LABOR STANDARDS ACT – RETALIATION

42. Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

43. Defendants discharged Iannotti because she filed a complaint of wage and hour violations, thus violating the anti-retaliation provision of the FLSA, 29 U.S.C. §215(a)(3).

44. Defendants' decision to terminate Iannotti was induced by their intent to retaliate against her because of her complaint of wage and hour violations, as evidenced by Smith's treatment of Iannotti following her complaint, as detailed above, and the timing of the events described above.

45. Iannotti has been directly harmed as a result of Defendants' violations as is fully set forth above.

## COUNT II – VIOLATION OF FAIR LABOR STANDARDS ACT – MINIMUM WAGE AND OVERTIME

46. Plaintiff incorporates by reference the averments contained in the preceding paragraphs as if set forth fully herein.

47. Defendants were required at all times during Iannotti's employment to pay minimum wage and overtime as required by the FLSA, 29 U.S.C. §§ 206, 207.

48. As fully described above, Defendants failed to pay Iannotti's minimum wage and overtime to which she was entitled under the FLSA, by forcing her to work in excess of 40 hours per workweek without compensation.

49. Iannotti has been directly harmed as a result of Defendants' violations as is fully set forth above.

## COUNT III – VIOLATION OF PENNSYLVANIA MINIMUM WAGE ACT – MINIMUM WAGE AND OVERTIME

50. Plaintiff incorporates by reference the averments contained in the preceding paragraphs as if set forth fully herein.

51. Defendants were required at all times during Iannotti's employment to pay minimum wage and overtime as required by the PMWA, 43 P.S. § 333.101, *et. seq.*

52. As fully described above, Defendants failed to pay Iannotti's minimum wage and overtime to which she was entitled under the PMWA, by forcing her to work in excess of 40 hours per workweek without compensation.

53. Iannotti has been directly harmed as a result of Defendants' violations as is fully set forth above.

## COUNT IV - VIOLATION OF PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW

54. Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

55. Defendants have unlawfully withheld wages earned by Iannotti which are due and payable to her, in violation of the WPCL, 43 P.S. § 260.5.

56. As fully described above, Defendants failed to pay Iannotti wages for all of the work she performed for Defendants.

57. Iannotti has been directly harmed as a result of this violation as is fully set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Honorable Court will:

(a) Assume jurisdiction herein;

(b) Declare Defendants' conduct to be unlawful and an intentional violation of Plaintiff's rights;

(c) Award Plaintiff wage loss damages, including back pay and front pay and lost fringe and other benefits of employment, including commissions and health benefits under the FLSA for retaliation;

(d) Award Plaintiff wages earned, including overtime pay, that are due and payable under the Wage Payment and Collection Law, FLSA, and PAMWA;

(e) Award Plaintiff liquidated damages under the FLSA and Wage Payment and Collection Law;

(f) Award Plaintiff compensatory and punitive damages under the FLSA for retaliation;

(g) Award Plaintiff damages associated with the increased tax burden of any award;

(h) Award Plaintiff prejudgment and post-judgment interest;

(i)     Award Plaintiff costs and attorneys' fees; and

(j)     Grant such other relief as the Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Respectfully Submitted,

s/ David B. Spear
David B. Spear
PA Id. No. 62133

Nick Kennedy
PA Id. No. 317386

Minto Law Group, LLC
603 Stanwix Street, Suite 2025
Pittsburgh, PA 15222